***********
This matter was reviewed by the Full Commission based upon the record of the proceedings before the late Deputy Commissioner Nancy Gregory, along with the briefs and arguments on appeal. Accordingly, the Full Commission REVERSES IN PART and AFFIRMS IN PART the Deputy Commissioner's holding and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties at the hearing before the Deputy on 20 July 2000 as:
 STIPULATIONS
1. On August 16, 2001, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On that date, an employment relationship existed between plaintiff and defendants. Defendant-employer was not self-insured, but it had a $250,000 retention per claim with CNA Claims Plus.
3. Plaintiff's average weekly wage is disputed. Plaintiff's wage records and a Form 22 for a similarly situated employee are stipulated into evidence.
4. Defendants have denied liability for plaintiff's claim and have paid plaintiff no disability compensation.
5. Plaintiff last worked for defendant on August 23, 2003.
6. The following documentary exhibits are stipulated into evidence by the parties:
(a) Industrial Commission forms 18, 19, 33, 33R, and 61;
(b) All of defendants' discovery responses;
(c) All of plaintiff's discovery responses;
(d) All of plaintiff's medical records;
(e) All of plaintiff's employment records;
(f) Plaintiff's recorded statements;
(g) Revlon computer printouts reflecting weekly wages earned by plaintiff.
 ***********
Based upon the evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 42 years old and had received his high school diploma in 1979 and a truck-driving license "Class B CDL" in or about 1991. Plaintiff has a work history, which includes inventory control and work as a cook and a driver. Plaintiff's last employment prior to working for defendant-employer consisted of driving a dump truck with no loading or lifting.
2. Plaintiff began his employment with defendant-employer on June 11, 2001 in the position of Inventory Technician. The physical requirements of the job include the ability to lift 40 to 75 pounds, to move or manipulate 350-pound drums consistently, and to stand for extended periods of time. During a shift, plaintiff spent the majority of his time lifting or moving barrels of varying weights depending on whether they were filled to capacity.
3. As an Inventory Technician, plaintiff typically worked the 3rd shift and earned $8.70 per hour. Plaintiff occasionally worked overtime. According to the wage forms stipulated into evidence, plaintiff's average weekly wage at Revlon was $417.06, which yields a weekly compensation rate of $278.05. While plaintiff worked for defendant-employer for less than 52 weeks prior to his injury by accident, this method of calculation using less than 52 weeks is fair to the parties and it is not impractical to calculate plaintiff's wages using less than 52 weeks. Furthermore, the next method of calculation using the wages of a similar employee is not appropriate under the circumstances because the previous method may be used.
4. Upon beginning his employment with defendant-employer, plaintiff reported a preexisting medical condition of "pain, numbness, or tingling of the fingers." However, plaintiff noted that this was secondary to sleeping on his hand. There is no evidence of record that plaintiff received medical treatment for a left hand or arm condition prior to his injury by accident.
5. On Thursday, August 16, 2001, plaintiff performed lifting and moving barrels for the majority of the night, as the two co-workers with whom he worked that night were not capable of lifting to the same extent as plaintiff. By 3:00 or 3:15 a.m., plaintiff had moved approximately sixteen barrels including moving barrels from pallets with two to three barrels on each pallet to a scale when he felt a "pop" and tightness in his back and neck as well as tingling in his left arm.
6. Thereafter, plaintiff notified his supervisor, Carol Ram, that he was experiencing tightness in his back as a result of handling drums. Plaintiff was instructed to rest and he remained for the duration of his shift but did not continue his job duties. Ms. Ram instructed plaintiff to seek treatment with Granville Family Medicine and an Office Visit Form was completed at approximately 4:00 a.m. indicating that plaintiff complained of stiffness and tightness in his upper back after lifting barrels. Ms. Ram filled out an accident report indicating that plaintiff restocked heavy drums all night and experienced progressing tightness in his back during his shift. Defendant-employer made no mention of an injury to plaintiff's upper extremities or neck in the initial documentation.
7. On August 16, 2001, plaintiff was treated at Granville Family Medicine by Dr. Meredith Kehrer, M.D., an expert in family medicine. On physical exam, Dr. Kehrer found back pain without weakness or numbness in plaintiff's legs. Plaintiff was diagnosed with a lumbar strain and restricted to light duty with no heavy lifting and instructed to return in 5 days. Specifically, plaintiff was restricted to no lifting greater than ten pounds with limited bending, stooping and reaching overhead until his return appointment. The medical record of Dr. Kehrer's treatment of plaintiff makes no mention of an injury to plaintiff's upper extremities or neck.
8. Defendant-employer has a light duty program to accommodate the restrictions of employees who have been injured on the job.
9. Plaintiff returned to work at defendant-employer in a light duty position on Friday, August 17, 2001. Plaintiff performed a small portion of the his regular job inventory tech control position and picked up samples such as a lipstick tube or a vile of perfume and other cosmetics and transported them to the laboratory for quality control testing. This work only consumed a small portion of plaintiff's 8-hour shift as he only performed the pickup two times during a shift.
10. After working through the night shift, plaintiff continued to suffer pain and felt numbness in his left hand and arm. On Saturday, August 18, 2001, after finishing his shift, plaintiff reported to the emergency room at Maria Parham Hospital where he complained of back pain and that his left arm and fingers had become numb; plaintiff was concerned he was having a stroke because he had never experienced similar symptoms. Plaintiff was provided a wrist splint and restricted to light duty work of no lifting, no bending, and no repetitive motion for 2 weeks or until he could be seen by and orthopedist.
11. On Monday, August 20, 2001, plaintiff reported to defendant-employer's Occupational Health Safety office where he reported having been seen at the emergency room after he developed left hand and arm numbness during his shift at work the previous Friday night. Plaintiff was informed that he must return to Granville Family Practice and an appointment was promptly scheduled. Nurse Faulkner wrote a note to Granville Family Practice on a Medical Report Form, which indicated that plaintiff's left arm numbness developed at work on August 17, 2001 and that the company now provided therapy on-site. Plaintiff requested a second opinion from Nurse Faulkner who noted plaintiff's request in the note to Granville Family Practice. Plaintiff's request was never addressed, however.
12. While the occupational health notes document that plaintiff was directed by the Nurse Faulkner to return to Granville Family Practice, the notes do not indicate whether plaintiff was instructed regarding the acceptance of his claim or the employer's right to direct medical treatment in an accepted claim. In fact, while defendants contend that they orally accepted plaintiff's claim, there is no specific evidence to support this contention or details regarding the oral acceptance. Furthermore, there is no written acceptance such as a letter or other document until the Form 60 submitted at the hearing before the Deputy Commissioner. Regardless, considering plaintiff's pain and the symptoms, which were unusual to plaintiff, his trip to Maria Parham can reasonably be considered an emergency.
13. On August 20, 2001, plaintiff returned to Granville Family Medicine at which time he was evaluated by Dr. Michael Mahan, M.D. and diagnosed with a low back strain and possible overuse or carpal tunnel of plaintiff's left arm and hand. Dr. Mahan instructed plaintiff to continue light duty for two weeks with no lifting and limited use of his left hand. Following his appointment, plaintiff returned to Nurse Faulkner who later contacted therapy for on-site treatment and contacted Dr. Mahan's office for "clarification of `no lifting'" which Dr. Mahan clarified with a new order of no lifting with plaintiff's left arm and five pounds or less with his right.
14. From Monday, August 20, 2001 through Thursday, August 23, 2001, plaintiff continued to report to work and perform light duty work consisting of collecting samples and little other activity. Plaintiff continued to experience pain and was concerned about his condition. Plaintiff expressed his desire for a second opinion to the plant nurses.
15. While working light duty for defendant-employer, plaintiff attended one physical therapy session on Wednesday, August 22, 2001 with Argosy Health Onsite. Plaintiff reported injuring himself on August 16, 2001 when he was lifting drums and felt a warm feeling and tightness in his lower back and neck. Plaintiff also reported experiencing numbness in his left hand on the morning of the next day. The physical therapist noted inconsistent physical findings with plaintiff's exam.
16. Due to plaintiff's continued pain and his desire for a second opinion due to his continued concerns, which he felt had not been addressed, plaintiff presented to Dr. James Green, M.D., on August 23, 2001. Plaintiff sought this treatment without seeking authorization from defendant-employer. Dr. Green examined plaintiff and wrote plaintiff out of work from August 23, 2001 until September 9, 2001, and referred him to Triangle Orthopedic Associates.
17. A second physical therapy appointment was scheduled for Friday, August 24, 2001, but plaintiff failed to attend as Dr. Green had removed him from work.
18. Without seeking authorization, plaintiff was examined and treated by Triangle Orthopedic Associates on Thursday, September 6, 2001, at which time physician's assistant Steve Abel saw him. Plaintiff complained of back, left hip, neck and left arm pain following an injury at work while lifting barrels. Plaintiff reported initially injuring his back and neck and then developing occasional hand numbness. Plaintiff also complained of pain radiating down his arm and into his left hip and leg. On examination of plaintiff's lumbar spine, Mr. Abel noted a positive straight leg raise for the left leg. However, no paraspinal muscle spasms and no weakness were found in plaintiff's legs. In examining plaintiff's upper extremities, Mr. Abel found no obvious motor weakness and noted that some possible weakness was likely effort-related. Mr. Abel restricted plaintiff from work until September 20, 2001, after a course of Prednisone. According to the medical note, Mr. Abel's decision to write plaintiff out of work was based on his belief that plaintiff would be required to perform heavy lifting with defendant-employer. While plaintiff did not inform Mr. Abel of the light duty work, plaintiff was experiencing significant pain. Furthermore, the "light duty" work given plaintiff was not suitable employment or reasonable transitional employment.
19. On September 20, 2001, plaintiff returned to Mr. Abel and reported severe pain in his low back and left leg but indicated that his neck pain and left arm pain was intermittent. Mr. Abel kept plaintiff out of work and ordered an MRI due to his complaints.
20. On September 26, 2001, plaintiff provided a recorded statement to defendant-carrier during which he related his back pain and left arm tingling which caused him to request a second opinion. Plaintiff expressed that he had requested a second opinion from defendant-employer but had not gotten a response. Plaintiff indicated that he was concerned about his condition because he had never experienced the same sensations and because he continued to experience pain even when performing no lifting. Plaintiff informed the adjuster of the scheduled MRI and indicated that his back pain was the most significant problem.
21. On October 15, 2001, plaintiff underwent an MRI, which revealed a small left-sided disc herniation at the L5-S1 level. Thereafter, on October 15, 2001, plaintiff returned to Mr. Abel for follow-up of his neck and back pain. Plaintiff reported improved arm pain with intermittent neck tightness. Plaintiff complained of severe back pain and left leg pain. Plaintiff had some leg numbness and weakness. Plaintiff was given Percocet and prescribed injections and restricted from work until November 26, 2001.
22. On October 31, 2001, plaintiff returned to Dr. Kehrer per the request of defendant-employer's nurse, Regina Ford. Plaintiff reported continued pain and related his recent treatment history; however, plaintiff's MRI and medical notes were not available so Dr. Kehrer made no recommendations and did not request that plaintiff return. Dr. Kehrer reported having discussed plaintiff with Nurse Ford who related that she felt plaintiff was malingering. Nurse Ford's opinion is afforded little weight.
23. On November 7, 2001, plaintiff underwent an epidural steroid injection administered by Dr. John Giusto. Thereafter, plaintiff returned to Triangle Orthopedic Associates where Mr. Abel saw him on November 27, 2001. Mr. Abel continued to write plaintiff out of work noting that he would be restricted for at least three months because Mr. Abel contemplated surgery. As a result, plaintiff completed a leave of absence form with defendant-employer on November 28, 2001 requesting 3 months off as a result of his injury.
24. On November 26, 2001, plaintiff filed a Form 33 request for hearing which requested payment of past and future medical treatment. This request for payment of unauthorized medical treatment was made within a reasonable time period and during a period when defendants' position with regard to acceptance of plaintiff's claim was very unclear.
25. On December 5, 2001, plaintiff was seen for the first time by orthopedic surgeon Dr. Dimmig. Dr. Dimmig's physical exam revealed a positive straight leg raise test on the left leg. Plaintiff did not complain of neck or upper extremity difficulties and indicated that the injection had been beneficial. Surgery was discussed but another injection was recommended prior to a decision regarding surgery. Dr. Dimmig noted that work would have to be modified in the meantime. Dr. Dimmig noted no specific restrictions and his notes do not indicate that he discussed work status with plaintiff. Furthermore, while the other office visits with Triangle Orthopedics were followed by specific work notes, there is no work note following Dr. Dimmig's office note. At Dr. Dimmig's deposition, he indicated that modified work would have consisted of no lifting over 15 to 20 pounds, limited bending, and an allowance of some time to sit down. Although plaintiff did not report to defendant-employer to determine if a position consistent with the restrictions provided at the deposition was available, plaintiff was continuing to experience pain and the assembler position was outside of the restrictions provided in hindsight by Dr. Dimmig. Furthermore, on November 27, 2001, Steve Able had removed plaintiff from work for a least three more months as per the note attached to plaintiff's leave of absence form contained in defendant-employer's personnel file. Considering the greater weight of the evidence, plaintiff was effectively written out of work and remained unable to work in accordance with Mr. Abel's recommendations.
26. Plaintiff's next appointment with Triangle Orthopedic Associates was on January 9, 2002 at which time plaintiff was treated by physician's assistant, Kevin Lavery. Plaintiff reported that he had received a second epidural steroid injection and that his pain had improved as a result. Mr. Lavery kept plaintiff out of work and understood that plaintiff was currently restricted from all work as per the November 27, 2001 note.
27. Plaintiff made no mention of neck or upper extremity pain during his November 27, 2001, December 5, 2001, and January 9, 2002 appointments with Triangle Orthopedics. However, on January 24, 2002, plaintiff complained of neck pain and increased back pain to Mr. Lavery. Plaintiff displayed a positive left straight leg raise test. Plaintiff was diagnosed with cervical pain but he declined the physical therapy that Mr. Lavery offered. No further treatment was recommended with regard to plaintiff's neck and he was prescribed medications for his back pain.
28. On February 6, 2002, plaintiff returned to Dr. Dimmig and complained of back pain as well as increased neck pain including radiating pain to the left shoulder. Plaintiff's subjective complaints were worse than in December 2002. Plaintiff's MRI films were not available that day. Dr. Dimmig gave plaintiff an injection for his shoulder pain, which was possibly caused by tendonitis.
29. On March 1, 2002, plaintiff returned to Dr. Dimmig and complained of diffuse left leg and hip weakness and global weakness of the left leg with a small amount of foot drop. Plaintiff's shoulder was improved and he was instructed to continue conservative treatment and was provided a prescription of Percocet. Dr. Dimmig did not address work restrictions. The issue of narcotic medication was addressed on March 13, 2002 when plaintiff telephoned for a refill several days early. Plaintiff indicated that his pain was not alleviated by the prescribed dose and that he was going out of town the next day and needed his refill before leaving. Medication issues were also discussed by Mr. Abel. Dr. Dimmig was concerned about plaintiff's medication regimen. However, Dr. Dimmig indicated that some of plaintiff's left hip and leg discomfort could be a result of his herniated disc. At the time of the hearing, plaintiff was no longer taking narcotic medications.
30. On April 3, 2002, plaintiff returned to Dr. Dimmig complaining of back pain and some weakness in the legs with improved left hip pain. Plaintiff's lower leg pain was absent and Dr. Dimmig noted that plaintiff did not receive physical therapy for his neck due to complications with the pool at the wellness center. Dr. Dimmig's examination notes indicated no global weakness or inconsistencies at this visit and he recommended a lumbar and cervical MRI and that work restrictions continue.
31. After his lumbar MRI, plaintiff was scheduled to undergo a lumbar discectomy, to be performed by Dr. Dimming on June 23, 2002. On June 7, 2002, Dr. Dimmig found a decreased range of motion and a somewhat positive straight left leg raise test with some weakness of the foot. Again, no issues of inconsistencies or diffuse or global weakness were present and surgery was recommended. Dr. Dimmig discussed the risks and benefits with plaintiff and indicated that there were no guarantees that he would improve. Dr. Dimmig excused plaintiff from work pending the surgery. However, based on plaintiff's understanding that the success rate was a 50-50 chance, he decided to cancel the surgery.
32. Both Dr. Dimmig and Dr. Kehrer stated that plaintiff's lower back condition, including his herniated disc, is related to his injury by accident. In addition, both stated that plaintiff's neck pain following the injury was also related to the injury by accident.
33. On July 18, 2002, after plaintiff cancelled his surgery, Dr. Dimmig declared plaintiff at maximum medical improvement. Although Dr. Dimmig initially assigned a 20% permanent impairment rating, he testified at deposition that a 20% rating was high and that, given plaintiff's lumbar condition, a rating of 10% to 15% was more accurate. Those restrictions, as set by Dr. Dimmig, are no repetitive bending, no lifting more than 15 to 20 pounds, and the ability to alternate sitting and standing throughout the day.
34. Plaintiff experienced pain and discomfort in his back, left hip and leg as a result of his herniated disc. Plaintiff suffered back and leg pain that improved over time.
35. Dr. Dimmig reviewed the assembler job description and stated that plaintiff could have performed most of the tasks but, depending on how tasks would be performed, plaintiff may not have been able to perform some tasks. Dr. Dimmig needed additional information on how often lifting 25 pounds would have been performed and how far or long the 25-pound boxes would have to be carried. Dr. Dimming was also concerned about whether bending would be required in placing boxes on pallets.
36. Plaintiff is no longer employed at defendant-employer as he was administratively terminated because his medical leave lasted longer than one year.
37. Defendants initially paid for plaintiff's medical treatment with authorized physicians at Granville Family Medical. Defendants contend that plaintiff's claim was initially treated as compensable and was accepted via oral communication. However, defendants made no written acceptance and it is unclear whether defendants paid medical bills without accepting the claim or whether they accepted it as a medical only claim. Furthermore, defendants did not address the issue of acceptance or denial in writing promptly after plaintiff was removed from work on August 24, 2002 and this matter was thereafter essentially treated as a denied claim. However, even if defendant-employer's alleged oral acceptance evidenced by the provision of immediate medical care is sufficient to allow defendants the right to direct medical care, defendants failed to adequately and promptly provide care beginning in September 2002. On several occasions, plaintiff requested second opinions and, furthermore, plaintiff suffered an emergency situation when his fingers were numb and he sought emergency room treatment. In addition, plaintiff complied on the two occasions he was directed to return to the company doctor. Finally, on December 17, 2001, defendant-carrier's adjuster Karen Ross filed a Form 61 denying plaintiff's claim including on the grounds that he sustained no injury by accident which is in complete contradiction to defendants' contention that this was in fact an accepted claim. Defendants clearly had no right to direct medical treatment following December 17, 2001. Almost two years later, on the date of hearing, defendants filed a Form 60 accepting liability for "a low back strain" as a result of the injury plaintiff incurred on August 16, 2001; however, all disability and other compensable consequences were denied. In addition, plaintiff's cervical condition was not accepted.
38. Plaintiff has filed a motion for attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1 to which defendants objected on the grounds that this issue was not enumerated in the pre-trial agreement. However, the issue of sanctions pursuant to N.C. Gen. Stat. § 97-88.1 is within the discretion of the Industrial Commission and is appropriate for determination.
39. Defendants unreasonably denied this matter based on the grounds of the Form 61, which indicates plaintiff suffered no injury by accident. However, defendants' defense with regard to the extent of plaintiff's disability and his credibility was not unfounded. Accordingly, defendants did not defend this matter without reasonable grounds.
40. Plaintiff sustained an injury by accident on August 16, 2001 resulting in a lower back injury including a herniated disc as well as neck and left arm pain of an undetermined nature.
41. As a result of his injury by accident and resultant lumbar herniated disc, plaintiff sustained a 15% impairment rating to his back.
42. Plaintiff's former counsel has requested an attorney's fee. Plaintiff's former counsel provided valuable services to plaintiff; however, there is no affidavit concerning the hours expended. Plaintiff's current counsel has provided valuable legal services including litigating this matter at a hearing, obtaining deposition testimony of two expert witnesses and performing legal research and writing and submitting contentions and a proposed Opinion and Award. The current and former counsels have not yet agreed upon their respective fees; however current counsel is willing to hold $2,000.00 in trust pending an agreement. A reasonable and customary attorney's fee is twenty-five percent of the total award of compensation.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On August 16, 2001, plaintiff suffered a compensable injury by accident within the course and scope of his employment at defendant-employer, which resulted in a herniated disc at the L5-S1 level as well as neck and left arm pain. N.C. Gen. Stat. § 97-2(6).
2. As calculated by the third method, plaintiff's average weekly wage is $417.06, which yields a compensation rate of $278.05. The fourth method involving a similar employee's wages is inappropriate considering that the third method does not yield unfair results and it is not impractical. N.C. Gen. Stat. § 97-2(5).
3. As a result of his compensable injury on August 16, 2001, plaintiff is entitled to temporary total disability compensation at a rate of $278.05 from August 23, 2001 and continuing until plaintiff returns to work or an order of the Commission. N.C. Gen. Stat. § 97-31.
4. Plaintiff is entitled to have defendants pay all reasonably necessary medical expenses for treatment related to plaintiff's injury by accident and incurred or to be incurred for so long as such treatment is reasonably necessary to effect a cure or provide relief or lessen the period of disability including treatment with or directed by Triangle Orthopedics, Dr. Green, Mariah Parham Hospital and all providers selected by defendants regardless of the fact that defendants argue that treatment was unauthorized and that defendants had the right to direct treatment. While defendants have the right to direct treatment in an accepted case and while a Form 60 is not required for acceptance, it is unclear that oral acceptance is sufficient to trigger defendants' right to direct care. Regardless, defendants did eventually deny this case and failed to adequately and promptly direct care during the alleged period of acceptance. Furthermore, considering plaintiff's requests for a second opinion and that his request for approval of treatment was made within a reasonable time, plaintiff's actions in seeking unauthorized medical treatment were reasonable and the treatment was beneficial to effect a cure or provide relief. Schofield v. Great Atlantic Pacific Tea Co.,299 N.C. 582, 587, 264 S.E.2d 56, 60 (1980); Kanipe v. Lane Upholstery,141 N.C. App. 620, 540 S.E.2d 785 (2000); N.C. Gen. Stat. §§ 97-25;97-25.1.
5. Defendants are not entitled to strike plaintiff's motion for N.C. Gen. Stat. § 97-88.1 fees. However, considering the greater weight of the evidence and defendants' contentions with regard to disability and credibility, plaintiff is not entitled to an assessment of costs and fees pursuant to N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Defendants shall pay plaintiff temporary total disability benefits from August 23, 2001 and continuing at a weekly rate of $278.05 until plaintiff returns to work or further order of the Commission, subject to a reasonable attorney's fee allowed herein. All accrued amounts shall be paid in one lump sum.
2. Subject to statutory limitations, defendants shall pay all reasonably necessary medical expenses for treatment related to plaintiff's injury by accident and incurred or to be incurred for so long as such treatment is reasonably necessary to effect a cure or provide relief or lessen the period of disability including treatment with or directed by Triangle Orthopedics, Dr. Green, Mariah Parham Hospital and all providers selected by defendants.
3. Plaintiff's motion for attorney's fees and costs pursuant to N.C. Gen. Stat. § 97-88.1 is hereby and the same shall be denied.
4. A reasonable attorney's fee in the amount of 25% of the amounts due plaintiff pursuant to paragraph one is hereby approved for plaintiff's counsel. Twenty-five percent of the accrued amount shall be deducted and paid directly to plaintiff's counsel. Thereafter, every fourth check shall be sent directly to plaintiff's counsel. Plaintiff's current counsel shall consult with plaintiff's former counsel regarding an agreement on a reasonable fee and retain $2,000.00 in trust pending such agreement or resolution.
5. Defendants shall pay the costs of this appeal.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER